1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
9                                    AT TACOMA

10

11    LEDA HEALTH CORPORATION,              CASE NO. 2:24-cv-00871-DGE

                          Plaintiff,        ORDER ON MOTION FOR
12                                          PRELIMINARY INJUNCTION
            v.                              (DKT. NO. 10), MOTION TO
13                                          DISMISS (DKT. NO. 30), AND
      JAY ROBERT INSLEE et al.,             MOTION FOR EVIDENTIARY
14                                          HEARING (DKT. NO. 34)
                          Defendant.
15

16                          **I      INTRODUCTION**

17          This matter comes before the Court on Plaintiff's motion for a preliminary injunction

18    (Dkt. No. 10) and Defendants' motion to dismiss for failure to state a claim (Dkt. No. 30).

19    Defendants filed a response to Plaintiff's motion for injunctive relief (Dkt. No. 18), to which

20    Plaintiff replied (Dkt. No. 29).  Plaintiff subsequently filed a motion for an evidentiary hearing

21    (Dkt. No. 34), to which Defendants responded (Dkt. No. 36), Plaintiff replied (Dkt. No. 39), and

22    Defendant surreplied (Dkt. No. 40).  Plaintiff then filed a response to Defendants' motion to

23    dismiss (Dkt. No. 37), to which Defendant replied (Dkt. No. 41).  Upon careful consideration of

24

the briefing filed by both parties, the Court concludes this matter is suitable for disposition

without oral argument.  *See* LCR 7(b)(4); *United States v. State of Or.,* 913 F.2d 576, 582 (9th

Cir. 1990) ("[W]e have rejected any presumption in favor of evidentiary hearings[.]").

The Court DENIES Plaintiff's motion for a preliminary injunction and GRANTS

Defendants' motion to dismiss for the reasons set forth below.  Accordingly, Plaintiff's motion

for an evidentiary hearing is DENIED as moot, and Defendants' surreply is also moot.

## II    BACKGROUND

### A.  Factual Background

Leda Health is a company known for developing Early Evidence Kits ("EEKs")—

products that allegedly enable sexual assault survivors to "self-collect and store evidence such as

DNA" if they are unable or unwilling to seek a traditional forensic medical examination.  (Dkt.

No. 11 at 4.)  Each EEK is branded with a unique barcode and contains an instruction manual on

DNA self-collection, diagnostic swabs, sterile water for swabbing dry areas, a prepaid FedEx bag

for shipping to an accredited partner lab, tamper-evident tape, plastic bags for storing clothing or

other relevant items, and an intake form for documenting the assault and chain of custody.  (*Id*. at

6.)  Leda sells its EEKs to companies or other entities with which it partners—including sorority

chapters on college campuses.  (*Id*. at 5.)  In 2022, Leda attempted to partner with the University

of Washington's Kappa Delta sorority.  (*Id*. at 4.)

On October 31, 2022, the Washington State Attorney General's Office (AGO) issued

Leda a cease-and-desist notification.  The letter directed Leda to "immediately cease and desist

from advertising, marketing, and sales to Washington consumers related to its 'Early Evidence

Kits' on the basis that Leda's business practices related to these kits violated the Washington

Consumer Protection Act."  (Dkt. No 19-1 at 29.)  The letter stated that "Leda's claims regarding

the admissibility of its at-home kits have the capacity to deceive a Washington consumer into believing that its Early Evidence Kits have equivalent evidentiary value to a sexual assault evidence kit ("SAEK") administered by a medical professional."  (*Id*. at 30).  The notice went on to assert that the self-administered nature of Leda's EEKs would predictably result in "numerous barriers to admission as evidence, including on the basis of potential cross-contamination, spoilation, and validity."  (*Id*.)  It emphasized that, in Washington, exams by a trained Sexual Assault Nurse Examiner (SANE) are "both free and routinely admissible."  (*Id*. at 31.)  Thus, the letter concluded that "Leda charging consumers for Early Evidence Kits despite the fact they are unlikely to be admissible in a criminal court is an unfair and deceptive business practice" in violation of the Washington Consumer Protection Act.  (*Id*.)

Washington was not the first state to raise concerns about the emergence of at-home sexual assault evidence collection kits.  In 2019, Attorneys General from New York, Oklahoma, Connecticut, Michigan, North Carolina, Hawaii, and Florida sent cease and desist notifications to Leda's precursor company, MeToo Kits.  (*See* Dkt. No. 19-1 at 35–67.)  In 2020, New Hampshire's legislature passed a bill establishing that "[n]o person shall sell or offer for sale in the state of New Hampshire an over-the-counter rape test kit."  N.H. Rev. Stat. § 359-R:1. Washington and Maryland[1] followed New Hampshire's lead.

On January 24, 2023, Washington's legislature first considered House Bill 1564: "An Act Relating to prohibiting the sale of over-the-counter sexual assault kits."  (Dkt. No. 19-1 at 3.) After multiple hearings, the bill was passed and went into effect on July 23, 2023.  (Dkt. No. 30 at 13.)  Several representatives from Leda Health testified at the hearings, asserting that Leda's

---

[1] *See* Md. Code Ann. Com. Law § 14-4602 - Sale, offer for sale, or distribution of a self-administered sexual assault kit prohibited.

kits are not misleading but rather intended to be an additive option for the approximately 70% of sexual assault victims who do not go to the hospital, or for those who go but are not able to see a SANE nurse. (Dkt. No. 13 at 181.) Leda further stated that while the company did not guarantee evidence admissibility, it had procedures in place to establish chain of custody and believed that evidence from its kits should be admissible in court. (*Id*.) Nevertheless, the legislature found that "[a]t-home sexual assault test kits create false expectations and harm the potential for successful investigations and prosecutions." 2023 Wash. Sess. Laws, ch. 296, § 1. Thus, it concluded "[t]he sale of over-the-counter sexual assault kits may prevent survivors from receiving accurate information about their options and reporting processes; from obtaining access to appropriate and timely medical treatment and follow up; and from connecting to their community and other vital resources." *Id*. Entitled "[o]ver-the-counter sexual assault kits" and codified at Washington Revised Code § 5.70.070, the act establishes that:

> (2) A person may not sell, offer for sale, or otherwise make available a sexual assault kit:
>
> a) That is marketed or otherwise presented as over-the-counter, at-home, or self-collected or in any manner that indicates that the sexual assault kit may be used for the collection of evidence of sexual assault other than by law enforcement or a health care provider; or
>
> b) If the person intends, knows, or reasonably should know that the sexual assault kit will be used for the collection of evidence of sexual assault other than by law enforcement or a health care provider.

Wash. Rev. Code § 5.70.070(2). The statute defines "sexual assault kit" as "a product with which evidence of sexual assault is collected." Wash. Rev. Code § 5.70.070(1). It further stipulates that a violation of the section constitutes "an unfair or deceptive act in trade or commerce and an unfair method of competition for the purpose of applying [Washington's] consumer protection act." Wash. Rev. Code § 5.70.070(3).

**B. Procedural History**

1       On June 17, 2024, Plaintiff filed a Complaint for declaratory and injunctive relief,

2 asserting that Washington Revised Code § 5.70.070 (hereinafter referred to as the Statute) is

3 unconstitutional on multiple counts in violation of 42 U.S.C. § 1983.  (Dkt. No. 1.)  The

4 Complaint claims that the Statute impermissibly regulates protected speech in violation of the

5 First and Fourteenth Amendments and is thus unconstitutional facially and as applied to Leda

6 Health.  (*Id*. at 13–16.)  The complaint further alleges that the Statute is void for overbreadth and

7 vagueness, both facially and as applied, and that it constitutes an unconstitutional bill of

8 attainder.  (*Id*. at 16–20.)  Shorty after filing the Complaint, Plaintiff brought the instant motion

9 for a preliminary injunction to prevent enforcement of the Statute on the same grounds.  (Dkt.

10 No. 10.)  Defendant then filed a motion to dismiss.  (Dkt. No. 30).

### III      MOTION FOR PRELIMINARY INJUNCTION

#### A.  Legal Standard

13       Governed by Federal Rule of Civil Procedure 65(a), a "preliminary injunction is an

14 extraordinary remedy never awarded as of right."  *Winter v. NRDC*, 555 U.S. 7, 24 (2008).  To

15 obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the

16 merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the

17 balance of equities tips in his favor, and that an injunction is in the public interest."  *Id*. at 20.

18 "In each case, courts 'must balance the competing claims of injury and must consider the effect

19 on each party of the granting or withholding of the requested relief.'"  *Id*. at 24 (quoting *Amoco

20 Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)).  In so doing, a court must "pay

21 particular regard for the public consequences in employing the extraordinary remedy of

22 injunction."  *Id*. (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  The Ninth

23 Circuit has adopted a sliding scale test for preliminary injunctions in which "a stronger showing

24

1  of one element may offset a weaker showing of another." *All. for the Wild Rockies v. Cottrell*,

2  632 F.3d 1127, 1131 (9th Cir. 2011).  Thus, "serious questions going to the merits and a balance

3  of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

4  injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

5  that the injunction is in the public interest." *Id*. at 1135 (internal quotations removed).

6  **B.  Likelihood of Success on the Merits and Irreparable Harm**

7  "The loss of First Amendment freedoms . . . unquestionably constitutes irreparable

8  injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976).  Accordingly, "[w]hen a party seeks a

9  preliminary injunction on the basis of a potential First Amendment violation, the likelihood of

10  success on the merits will often be the determinative factor." *Joelner v. Vill. of Washington

11  Park, Illinois*, 378 F.3d 613, 620 (7th Cir. 2004) (citing *Connection Distrib. Co. v. Reno*, 154

12  F.3d 281, 288 (6th Cir. 1998) ("[T]o the extent that [a plaintiff] can establish a substantial

13  likelihood of success on the merits of its First Amendment claim, it also has established the

14  possibility of irreparable harm as a result of the deprivation of the claimed free speech rights");

15  *see also Doe v. Harris*, 772 F.3d 563, 583 (9th Cir. 2014) ("A colorable First Amendment claim

16  is irreparable injury sufficient to merit the grant of relief") (internal quotations omitted).

17  1.  Facial First Amendment Claim

18  To mount a facial First Amendment challenge, a plaintiff must establish "that no set of

19  circumstances exists under which the Act would be valid"—in other words, that the law in

20  question is unconstitutional in all its applications.  *United States v. Salerno*, 481 U.S. 739, 745

21  (1987).  Facial challenges are generally disfavored; "the Supreme Court has entertained facial

22  freedom-of-expression challenges only against statutes that, by their terms, sought to regulate

23  spoken words, or patently expressive or communicative conduct such as picketing or

24

handbilling." *Roulette v. City of Seattle*, 97 F.3d 300, 303 (9th Cir. 1996) (internal citations omitted).

Focusing on subsection (2)(a) of the Statute, Plaintiff alleges that law "does not ban the sale of EEKs" but rather "regulates how and what companies like Leda Health can tell people about their own products." (Dkt. No. 10 at 9.)  In this way, Plaintiff construes the Statute as a "marketing ban" that "aims to eliminate a specific substantive message—that sexual assault kits are available for use 'over-the-counter, at-home or for personal self-collection' without the involvement of law enforcement or a health care provider." (*Id.* at 12) (quoting Wash. Rev. Code § 5.70.070(2)(a)).  The Statute thereby functions as a content-based regulation on how a sexual assault kit can be described and who can describe it, Plaintiff asserts. (*Id.* at 13) (quoting *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 340 (2010) ("[T]he First Amendment stands against attempts to disfavor certain subjects or viewpoints [as well as] restrictions distinguishing among different speakers, allowing speech by some but not others.")).  Because a state cannot ban "the dissemination of truthful commercial information in order to prevent members of the public from making bad decisions with the information," the Statute is facially unconstitutional, Plaintiff concludes. (*Id.* at 14) (quoting *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 577 (2011)).

Defendant responds that Plaintiff "fundamentally mischaracterizes H.B. 1564 as banning marketing or speech about over-the-counter sexual assault kits." (Dkt. No. 18 at 8.)  The Statute, Defendant counters, does not implicate speech at all, but rather regulates the non-expressive conduct of selling, offering for sale, or otherwise making available over the counter sexual assault kits. (*Id.* at 16.)  Defendant supports this argument by pointing out that there is nothing in the Statute that prevents Plaintiff from "telling people that they can self-collect evidence" or

"promoting the supposed benefits of EEKs or instructing people on how to use EEKs" or

"answering questions from people about EEKs." (*Id*. at 17.)  Instead, the law is only triggered if

a person sells, offers to sell, or otherwise distributes the products in question.  (*Id*. at 17.)

Defendant further asserts that the Statute's prohibition on offering to sell sexual assault kits does

not implicate the First Amendment because "[o]ffers to engage in illegal transactions are

categorically excluded from First Amendment protection." *United States v. Williams*, 553 U.S.

285, 297 (2008)).

The Supreme Court is clear that "restrictions on protected expression are distinct from

restrictions on economic activity or, more generally, on nonexpressive conduct" and that "the

First Amendment does not prevent restrictions directed at commerce or conduct from imposing

incidental burdens on speech." *Sorrell,* 564 U.S. at 567.  Thus, to determine whether the Statute

operates as a restriction on "commerce or conduct" or whether it implicates protected speech, the

Court must construe the Statute.  *See Williams*, 553 U.S. at 293 ("The first step . . . is to construe

the challenged statute.").

"When interpreting state laws, a federal court is bound by the decision of the highest state

court." *In re Kirkland*, 915 F.2d 1236, 1238 (9th Cir. 1990).  "In the absence of such a decision,

a federal court must predict how the highest state court would decide the issue." *Id*. at 1239.

Washington courts begin statutory interpretation with the statute's "plain meaning," which "'is to

be discerned from the ordinary meaning of the language at issue, the context of the statute in

which that provision is found, related provisions, and the statutory scheme as a whole.'" *Lake v.

Woodcreek Homeowners Ass'n*, 243 P.3d 1283, 1288 (Wash. 2010) (quoting *State v. Engel*, 210

P.3d 1007, 1010 (2009)).  "If the statute is unambiguous after a review of the plain meaning, the

court's inquiry is at an end." *Id*.  The court must "bear in mind that '[a] statute, of course, is to

1   be construed, if such a construction is fairly possible, to avoid raising doubts of its

2   constitutionality.'" *Ass'n of Nat. Advertisers, Inc. v. Lungren*, 44 F.3d 726, 729 (9th Cir. 1994)

3   (citing *St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 780 (1981)).

4          Plaintiff's argument that the Statute primarily bans speech is undermined by the clear

5   language of the regulation itself, which states that: "[a] person may not sell, offer for sale, or

6   otherwise make available a sexual assault kit."  Wash. Rev. Code § 5.70.070(2).  The Statute's

7   operative verbs—"sell," "offer for sale," and "make available"— contemplate transactional

8   conduct, i.e. the transfer of a sexual assault kit from one person to another, and not speech or

9   expression.  *C.f. Williams*, 533 U.S. at 294.  The Statute goes on to specify that a person may not

10  sell, offer for sale, or otherwise make available a sexual assault kit "[t]hat is marketed or

11  otherwise presented as over-the-counter, at-home, or self-collected" or "[i]f the person intends,

12  knows, or reasonably should know that the sexual assault kit will be used for the collection of

13  evidence of sexual assault other than by law enforcement or a health care provider."  Wash. Rev.

14  Code § 5.70.070(2).  The first subsection ("marketed or otherwise presented") identifies what

15  kinds of sexual assault kits are banned for sale based on the kit's stated use (at-home evidence

16  collection).  Wash. Rev. Code § 5.70.070(2)(a).  In this way, the Statute appears analogous to the

17  FDA's "use of a product's marketing and labeling to discern to which regulatory regime a

18  product is subject."  *Nicopure Labs, LLC v. Food & Drug Admin*., 944 F.3d 267, 282 (D.C. Cir.

19  2019) (citing *Whitaker v. Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004)).

20         The D.C. Circuit has held that "the FDA's reliance on a seller's claims about a product as

21  evidence of that product's intended use, in order that the FDA may correctly classify the product

22  and restrict it if misclassified, does not burden the seller's speech."  *Id*. at 283.  For example, in

23  *Nicopure Labs,* an e-cigarette manufacturer and distributor challenged two provisions of the

24

Tobacco Control Act (TCA) on First Amendment grounds—the premarket review pathway and the free sample ban. The premarket review pathway classified products for regulation and review based on "how the manufacturer describe[d] the product's characteristics and intended use." *Nicopure,* 944 F.3d at 282. The plaintiff argued that this use of a manufacturer's claims—"such as the claim that the product is 'safer than cigarettes'"—to assign the product to a review pathway impermissibly burdened speech. *Id.* The court was "unpersuaded" by this argument. *Id.* As the panel explained, "[j]ust as the government may consider speech that markets a copper bracelet as an arthritis cure or a beach ball as a lifesaving flotation device in order to subject the item to appropriate regulation, so, too, the FDA may rely on e-cigarette labeling and other marketing claims in order to subject e-cigarettes to appropriate regulation." *Id.* at 283.

Here, the Statute similarly uses the marketing speech accompanying a sexual assault kit to subject the product to "appropriate regulation"—a ban on the sale or distribution of kits intended for use in the self-collection of evidence following sexual assault under Washington Revised Code § 5.70.070. *Id.* In both *Nicopure* and *Whitaker*, its predecessor case, the product in question—like the sexual assault kits at issue here—could be lawfully sold if the substance went "unaccompanied by the speech that characterized it." *Nicopure,* 944 F.3d at 284. Just as the "classification of a substance as a 'drug' turn[ed] on the nature of the claims advanced on its behalf" in *Whitaker*, so too does the classification of a sexual assault kit as banned for sale turn on whether it is "marketed or otherwise presented as over-the-counter." *Whitaker v. Thompson*, 353 F.3d 947, 953 (D.C. Cir. 2004). This use of speech to determine whether the conduct of selling the product as-labeled is unlawful "does not run afoul of the First Amendment." *Nicopure,* 944 F.3d at 284; *see also Whitaker*, 353 F.3d at 958 (citing *Wisconsin v. Mitchell*, 508 U.S. 476, 489 (1993)) ("the First Amendment allows 'the evidentiary use of speech to establish

the elements of a crime or to prove motive or intent'").[2]  The *Nicopure* court further concluded

that any commercial speech related to the sale of the product as labeled did not implicate the

First Amendment, as "[i]t is well established that 'commercial speech related to illegal activity'

is not subject to constitutional protection."  *Id*. (quoting *Central Hudson Gas & Electric Corp. v.*

*Public Service Commission* 447 U.S. 557, 564 (1980)).

Notably, the First Circuit independently reached the same conclusion when considering a

similar First Amendment challenge to a local ordinance that restricted flavored tobacco products.

*See Nat'l Ass'n of Tobacco Outlets, Inc. v. City of Providence, R.I.*, 731 F.3d 71 (1st Cir. 2013).

The City of Providence's so-called Flavor Ordinance established that it would be "unlawful for

any person to sell or offer for sale any flavored tobacco product to a consumer" and provided

that a "statement or claim made or disseminated by the manufacturer of a tobacco

product . . . that such tobacco product has or produces a characterizing flavor shall constitute

presumptive evidence that the tobacco product is a flavored tobacco product."  *Nat'l Ass'n of*

*Tobacco Outlets, Inc. v. City of Providence,* No. CA 12-96-ML, 2012 WL 6128707 at *19

(D.R.I. Dec. 10, 2012), *aff'd sub nom. City of Providence,* 731 F.3d.  Much like Plaintiff argues

here, the plaintiffs in *City of Providence* claimed that the Flavor Ordinance's "presumptively

ban[ning] products based on what Plaintiffs say about them" violated their First Amendment

rights.  *City of Providence*, 2012 WL 6128707 at *7.  But as the district court explained, "[t]he

inclusion of a 'public claim or statement made by the manufacturer' to determine whether the

described product falls under the definition of a 'flavored tobacco product' . . . does not amount

---

[2] Just as it is illegal for manufacturers to sell "saw palmetto" (an extract from the dwarf
American palm) under the label that it treats benign prostatic hyperplasia, Leda and other
manufacturers cannot sell a "kit" that is labeled for self-collection of evidence following a sexual
assault.  *See Whitaker*, 353 F.3d. at 233.

1    to a prohibition against speech." *Id*. at *8.  The definition of characterizing flavor "merely

2    serve[d] to explain which tobacco products fall under the prohibition." *Id*.  Likewise, subsection

3    2(a) of the Statute explains which sexual assault kits "fall under the prohibition": those that are

4    "marketed or otherwise presented as over-the-counter, at-home, or self-collected or in any

5    manner that indicates that the sexual assault kit may be used for the collection of evidence of

6    sexual assault other than by law enforcement or a health care provider."  Wash. Rev. Code

7    § 5.70.070(2)(a).  Thus, like the Flavor Ordinance, the Statute is an "an economic regulation of

8    the sale of a particular product" and not a regulation of speech.  *City of Providence*, 2012 WL

9    6128707 at *7.

10        To the extent that the Statue may incidentally implicate speech, the speech is commercial

11   in nature.  "[T]he core notion of commercial speech [is] speech which does no more than propose

12   a commercial transaction."  *Bolger v. Youngs Drug Prod. Corp*., 463 U.S. 60, 66 (1983) (quoting

13   *Va. State Bd. of Pharmacy*, 425 U.S. at 762) (internal quotations omitted).  "Speech [can]

14   properly be characterized as commercial when (1) the speech is admittedly advertising, (2) the

15   speech references a specific product, and (3) the speaker has an economic motive for engaging in

16   the speech."  *Am. Acad. of Pain Mgmt. v. Joseph*, 353 F.3d 1099, 1106 (9th Cir. 2004) (citing

17   *Bolger v. Youngs Drug Products Corp*., 463 U.S. 60, 66–67 (1983)).  The Ninth Circuit has

18   declined to limit the scope of commercial speech to "circumstances where clients pay for

19   services," emphasizing that advertisements or marketing that is "placed in a commercial context

20   and directed at the providing of services rather than toward an exchange of ideas" qualifies as

21   commercial speech even if the solicitation is of a non-paying client base.  *First Resort, Inc. v.

22   Herrera*, 860 F.3d 1263, 1273 (9th Cir. 2017).  Likewise, commercial speech remains

23

24

1    commercial even if it "contain[s] discussions of important public issues." *Bolger*, 463 U.S. at

2    67–68.

3            The Statute prohibits "offering" sexual assault kits "for sale"— speech that "does no

4    more than propose a commercial transaction." *Bolger,* 463 U.S. at 66.  Even a hypothetical

5    "offer for sale" at no cost (free distribution of EEKs) would still explicitly "reference the

6    product" itself and be directed at the "provision of services"—services that are typically

7    provided so that the company can turn a profit.  *Joseph*, 353 F.3d at 1006; *Herrera*, 860 F.3d, at

8    1263.  This too meets the definition of commercial speech.  To the extent that the marketing

9    language in subsection 2(a) burdens speech, it only does so if a person is selling a kit that is

10   "marketed or otherwise presented as over-the-counter"; critically, it is the sale or distribution of a

11   product meeting the description in 2(a) that triggers the statute.  Thus, to the extent that the

12   Statute implicates speech, the speech is "'linked inextricably' with the commercial arrangement

13   that it proposes." *Edenfield v. Fane*, 507 U.S. 761, 767 (1993) (quoting *Friedman v. Rogers*, 440

14   U.S. 1, 10, n. 9 (1979)).

15          The Supreme Court has developed a four-part test regarding the permissible regulation of

16   commercial speech.  *Central Hudson*, 447 U.S. at 566.  "At the outset" a court must determine

17   whether the expression is protected at all; "[f]or commercial speech to come within that

18   provision, it at least must concern lawful activity and not be misleading."  *Id*.  This initial inquiry

19   is where the court in *City of Providence* ended its analysis, as the Ordinance itself "precluded

20   [Plaintiff] from selling flavored tobacco products in Providence" and thus any offer to sell the

21   product constituted an act proscribed by law.  *City of Providence*, 2012 WL 6128707 at *8.  As

22   the First Circuit panel emphasized in regard to a second Ordinance that was challenged in the

23   *City of Providence* suit (the Price Ordinance) "[h]ere, the 'offers' and other forms of allegedly

24

commercial speech restricted by the Price Ordinance are offers to engage in unlawful activity; that is, sales of tobacco products by way of coupons and multi-pack discounts, which are banned by the Price Ordinance itself." *City of Providence*, 731 F.3d at 78.  Similarly, the *Nicopure* court concluded that because "speech proposing an illegal transaction is speech which a government may regulate or ban entirely . . . the FDA does not run afoul of the First Amendment when it relies on manufacturer statements." *Nicopure*, 944 F.3d at 284 (citing *Hoffman Estates*, 455 U.S. at 496).

Likewise, the Statute explicitly forbids the sale or distribution of sexual assault kits for use in the self-collection of evidence.  Any "offer for sale" of an EEK thus constitutes an offer to engage in an illegal transaction, and such speech is "categorically excluded from First Amendment protection." *Williams*, 553 U.S. at 297; *Levi Strauss & Co. v. Shilon*, 121 F.3d 1309, 1312 (9th Cir. 1997).[3]  In other words, the Statute lawfully prohibits offers to engage in the very conduct that the Statute forbids.  Furthermore, any marketing represents "commercial speech related to illegal activity" if the company attempts to sell or otherwise make available the kits that meet the statutory description. *Central Hudson*, 447 U.S. at 564.  Otherwise, the Statute does not restrict marketing or advertising of at-home sexual assault kits.  Thus, the *Central Hudson* inquiry must end before it properly begins, as any speech implicated by the statute concerns illegal activity and is not protected. *See City of Providence*, 731 F.3d at 78.

---

[3] In evaluating a First Amendment challenge to a City of New York statute that banned the sale of tobacco products below the listed price, a district court similarly concluded that "offers that are restricted by the ordinance are offers to engage in an unlawful activity—namely, the sale of cigarettes and tobacco products below the listed price. Thus, the ordinance lawfully prohibits retailers from offering what the ordinance explicitly forbids them to do." *Nat'l Ass'n of Tobacco Outlets, Inc. v. City of New York*, 27 F. Supp. 3d 415, 423 (S.D.N.Y. 2014).

1    The caselaw Plaintiff relies on to argue that the Statute bans speech only further serves to

2    distinguish the Statute from laws that do implicate the First Amendment.  (*See* Dkt. No. 29 at 6–

3    7.)  For example, Plaintiff analogizes this case to *In re R.M.J.*, a matter that involved a restriction

4    on the categories of information and forms of printed advertisement that lawyers in the State of

5    Missouri could lawfully publish.  *In re R. M. J.*, 455 U.S. 191, 193 (1982).  Missouri's regulation

6    directly restricted a lawyer's freedom to publish "truthful advertising related to lawful

7    activities"—speech "entitled to the protections of the First Amendment."  *R.M.J.*, 455 U.S. at

8    203.  Here, the Statute does not restrict advertising or disseminating information about lawfully

9    sold products; as Defendants point out, it only regulates what people and businesses "must

10   *do*[,] . . . not what they may or may not *say*."  (Dkt. No. 18 at 17) (emphasis in original) (quoting

11   *Rumsfeld v. F. for Acad. & Institutional Rts., Inc*., 547 U.S. 47, 60 (2006)).  Plaintiffs may

12   market EEKs in any way they choose so long as they do not *sell* them.[4]

13   Likewise, Plaintiff's comparison to *Sorrell* is inapposite, as *Sorrell* involved a Vermont

14   statute that prohibited the sale of information for marketing purposes but allowed the same

15   information to be sold for "educational communications."  *Sorrell*, 564 U.S. at 564.  Unlike a

16   ban on the sale of sexual assault kits intended for at-home use, the product in question in *Sorrell*

17   was information itself (which is "speech within the meaning of the First Amendment").  *Id*. at

18   570.  Accordingly, the regulation not only restricted the creation, dissemination, and use of

19   speech, but also favored certain speakers (academic institutions) over others (marketers).  *Id*. at

20

21   [4] For the same reasons, this Statute is readily distinguishable from notable advertising cases, such

22   as *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 (1996) (prohibition on advertising prices of legal alcoholic beverages violated First Amendment) and *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 750 (1976) (prohibition on pharmacists

23   advertising information about legally prescribed prescription drugs violated First Amendment). The Statute does not regulate or restrict advertising—truthful or misleading—about at-home

24   sexual assault kits, but rather bans selling or otherwise making such kits available.

ORDER ON MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 10), MOTION TO DISMISS (DKT. NO. 30), AND MOTION FOR EVIDENTIARY HEARING (DKT. NO. 34) - 15

571 ("So long as they do not engage in marketing, many speakers can obtain and use the

information."). In this way, the law imposed a "speaker and content based burden on protected

expression" and did not survive heightened scrutiny. *Id.* Contrastingly, Washington has not

banned "all speech about 'sexual assault kits' that describes them as self-collected" as Plaintiffs

assert; it has banned the *sale* of sexual assault kits intended for at-home use. (Dkt. No. 29 at 7.)

Any person in Washington state remains free to disseminate as much accurate *or* misleading

information about sexual assault kits as they would like to whomever they would like—so long

as that individual does not sell or otherwise make available sexual assault kits that fall under the

prohibition in the Statute.

Having concluded that the Statute regulates commercial conduct, the Court briefly

considers whether the "particular conduct possesses sufficient communicative elements to bring

the First Amendment into play." *Philip Morris USA v. City & Cnty. of San Francisco*, No. C 08-

04482 CW, 2008 WL 5130460, at *2 (N.D. Cal. Dec. 5, 2008), *aff'd sub nom. Philip Morris

USA, Inc. v. City & Cnty. of San Francisco*, 345 F. App'x 276 (9th Cir. 2009) (unpublished).

Since "[e]very civil and criminal [regulation] imposes some conceivable burden on First

Amendment protected activities," conduct does not constitute protected speech whenever a

person aims to communicate an idea. *Philip Morris*, 345 F. App'x at 276 (quoting *Arcara v.

Cloud Books, Inc.*, 478 U.S. 697, 706, (1986)). Instead, "a facial freedom of speech attack must

fail unless, at a minimum, the challenged statute 'is directed narrowly and specifically at

expression or conduct commonly associated with expression.'" *Roulette v. City of Seattle*, 97

F.3d 300, 305 (9th Cir. 1996) (citing *City of Lakewood*, 486 U.S. at 760). For example, the

Supreme Court "has recognized the expressive nature of students' wearing of black armbands to

protest American military involvement in Vietnam; of a sit-in by blacks in a 'whites only' area to

1    protest segregation; of the wearing of American military uniforms in a dramatic presentation

2    criticizing American involvement in Vietnam; and of picketing about a wide variety of causes."

3    *Philip Morris,* 2008 WL 5130460, at *2 (citations omitted).

4           Plaintiff asserts that subsection 2(b) of the Statute regulates expressive conduct because it

5    "targets the intended message that accompanies the sale: that a common, otherwise-legal product

6    can be used by a survivor to-self collect evidence."  (Dkt. No. 29 at 6 n.3.)  However, the Ninth

7    Circuit has found that consummating a business transaction and selling goods constitutes

8    nonexpressive conduct unprotected by the First Amendment, and Plaintiff fails to distinguish this

9    caselaw.  *See, e.g., B&L Prods., Inc. v. Newsom,* 104 F.4th 108 (9th Cir. 2024); *Philip Morris,*

10   345 F. App'x at 276 ("[S]elling cigarettes isn't [protected expressive activity] because it doesn't

11   involve conduct with a significant expressive element . . . . It doesn't even have an expressive

12   component.").  For example, *B&L* concerned a California statute that banned contracting for,

13   authorizing, or allowing the sale of firearms or ammunition on Del Mar Fairgrounds property.

14   *B&L Prods,* 104 F.4th at 111.  The plaintiff asserted that the challenged statute specifically

15   targeted and "jeopardized the pro-gun speech that occurs at gun shows," including information

16   sharing and educational activities.  *B&L Prods,* 104 F.4th at 114.  However, the court pointed out

17   that a "celebration of America's gun culture . . . can still take place on state property, as long as

18   that celebration does not involve contracts for the sale of guns."  *Id.* at 114–115 (internal

19   quotations omitted).  Thus, because "'the only inevitable effect, and the stated purpose' of [the]

20   statute [was] to regulate nonexpressive conduct," the court concluded that "our inquiry is

21   essentially complete."  *Id.* at 116 (quoting *HomeAway.com, Inc.*, 918 F.3d at 685.)  So too here.

22   The only inevitable effect and the stated purpose of the Statute is to regulate nonexpressive

23   conduct—the sale of sexual assault evidence collection kits for at home use.  Leda can continue

24

to "celebrate" its message that survivors can self-collect evidence of sexual assault using a

certain product, so long as that celebration does not involve the sale of EEKs.

The *Nicopure* court's commentary is also instructive on this point.  Much like Plaintiff

asserts that an "intended message [] accompanies the sale" of an EEK (Dkt. No. 29 at 6 n.3),

Nicopure argued that providing free samples was "'expressive' because they convey[] important

information to smokers who want to switch to vapor products, including key consumer

information[.]"  *Nicopure*, 944 F.3d at 291 (internal quotations removed).  The court noted that

"[t]his extraordinary argument, if accepted, would extend First Amendment protection to every

commercial transaction on the ground that it 'communicates' to the customer 'information' about

a product or service."  *Id*.  However, as the *Nicopure* court emphasized, "the Supreme Court has

long rejected the 'view that an apparently limitless variety of conduct can be labeled 'speech'

whenever the person engaging in the conduct intends thereby to express an idea.'"  *Id*. (citing

*United States v. O'Brien*, 391 U.S. 367, 376 (1968)).  Thus, the court found that "the seller's

intention that those experiences leave consumers with helpful information that encourages future

purchases does not convert all regulation that affects access to products or services into speech

restrictions subject to First Amendment scrutiny."  *Id*.  The same can be said for Plaintiff's stated

intention that its sale or distribution of an EEK imparts information: that intent does not

transform the transaction into expressive conduct that implicates the First Amendment.  *Id*.

Accordingly, Plaintiff has failed to allege a facial First Amendment violation as a matter

of law and this claim would not succeed on the merits.  *See Winter*, 555 U.S. at 20. Thus,

because Plaintiff's only argument on irreparable harm is premised on the likely success on the

merits of its constitutional claims, Plaintiff does not establish a likelihood of irreparable harm on

this claim.  (*See* Dkt. No. 10 at 26.)

2.   As-Applied First Amendment Claim

Plaintiff asserts that the Statute "has been unconstitutionally applied to Leda Health because it was designed with it in mind" and "[t]he Legislature specifically targeted Leda Health through the Statute." (Dkt. No. 10 at 20.)  To support this argument, Plaintiff states "it is telling that Representative Mosbrucker specifically referenced Leda Health" in email communications about House Bill 1564.  (*Id.*)

Just as the facial impact of a statute may render it unconstitutional, if a statute's "stated purpose" is to suppress specific speech or ideas, a court may consider that purpose in determining the constitutionality of the regulation.  *Sorrell*, 564 U.S. at 565–566.  However, "[t]he Supreme Court has disclaimed the idea that 'legislative motive is a proper basis for declaring a statute unconstitutional' in the absence of a direct impact on protected speech."  *B&L Prods., Inc*. 104 F.4th at 116 (citing *United States v. O'Brien*, 391 U.S. 367, 383–84 (1968)).  Thus, when "the only inevitable effect, and the stated purpose of a statute is to regulate nonexpressive conduct," a "court may not conduct an inquiry into legislative purpose or motive beyond what is stated within the statute itself."  *Id.* at 116 (internal citations omitted); *see also HomeAway.com, Inc. v. City of Santa Monica*, 918 F.3d 676, 685 (9th Cir. 2019).  Because the stated purpose of the Statute is "prohibiting the sale of over-the-counter sexual assault kits" and the statute does not directly impact protected speech (*see supra* Section III.B.1), this Court may not further inquire into the legislature's motives.  (Dkt. No. 19-1 at 3.)  Thus, Plaintiff would not succeed on the merits of its as-applied First Amendment claim, as the Statute does not target Plaintiff's expression of ideas—rather, it prohibits specific non-expressive conduct exemplified

1    by Plaintiff's business model.[5]  And because Plaintiff's only argument on irreparable harm is

2    likely success on the merits, Plaintiff likewise cannot establish a likelihood of irreparable harm

3    on this claim.  (*See* Dkt. No. 10 at 26).[6]

4            3.   Overbreadth and Vagueness Claims

5            "According to our First Amendment overbreadth doctrine, a statute is facially invalid if it

6    prohibits a substantial amount of protected speech."  *Williams*, 553 U.S. at 292.  "Courts

7    vigorously enforce[] the requirement that a statute's overbreadth be *substantial*, not only in an

8    absolute sense, but also relative to the statute's plainly legitimate sweep."  *Id*. (emphasis in

9    original).  Here, Plaintiff fails to make out an overbreadth claim as a matter of law because the

10   Statute does not regulate protected speech, let alone prohibit "a substantial amount of protected

11

12

13   _____

14   [5] As the Ninth Circuit commented in *Philip Morris*, "[t]he censorial motive plaintiff attributes to
     defendants is always present when the government restricts the sales of a product."  *Philip
15   Morris,* 345 F. App'x at 276.  That alone "can't be sufficient" to raise First Amendment
     concerns, the court found.  *Id*.

16   [6] Additionally, Leda's claims about its EEKs would not be necessary for prosecution under the
     Statute because Leda separately meets the scienter requirement of subsection 2(b).  *See* Wash.
17   Rev. Code § 5.70.070(2) ("A person may not sell . . . a sexual assault kit if it is marketed . . . as
     over-the-counter . . . *or* [i]f the person intends, knows, or reasonably should know that the sexual
18   assault kit will be used for the collection of evidence of sexual assault other than by law
     enforcement or a health care provider") (emphasis added).  Leda asserts that the Statute "does
19   not punish the sale of a 'sexual assault kit' unless the seller describes it as 'over-the-counter,' 'at-
     home,' or 'self-collected.'"  (Dkt. No. 29 at 5.)  Yet this characterization conspicuously omits
20   subsection 2(b), which establishes that regardless of how a kit is marketed, it cannot be legally
     sold if the manufacturer *intends* that it be used for at-home evidence collection. Wash. Rev. Code
21   § 5.70.070(2).  Thus, the Statute prohibits the sale of *Leda's* EEK's no matter how they are
     labeled or marketed, because Leda affirmatively states that its "EEKs *are* intended for at-home
22   use [and] EEKs *are* for self-collection of evidence" (Dkt. No. 10 at 18) (emphasis in original).
     In this way, although a hypothetical retailer could perhaps sell sexual assault kits "in blank
23   packaging," (Dkt. No. 29 at 3), Leda itself could not. Thus, even assuming arguendo that
     subsection 2(a) implicates some speech, Leda's speech about the EEKs is likely superfluous for
24   the purposes of prosecution.

speech." *Id.; see supra* Section III.B.1.[7]  Moreover, "the overbreadth doctrine does not apply to commercial speech." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc*., 455 U.S. 489, 497 (1982).  Therefore, even if the Statute incidentally burdens speech, the overbreadth doctrine would remain inapplicable. *See supra* Section III.B.1 (finding that to the extent that the Statue implicates speech, the speech is commercial in nature).  Accordingly, Plaintiff's overbreadth claims would not succeed on the merits.

"A law that does not reach constitutionally protected conduct and therefore satisfies the overbreadth test may nevertheless be challenged on its face as unduly vague, in violation of due process." *Vill. of Hoffman*, 455 U.S., at 497.  "A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Williams*, 533 U.S. at 304.  In the First Amendment context, courts allow plaintiffs to argue that a statute is vague if it "is unclear whether [the statute] regulates a substantial amount of protected speech." *Id*.  When considering a vagueness challenge, a court should first "examine the facial vagueness challenge and, assuming the enactment implicates no constitutionally protected conduct, should uphold the challenge only if the enactment is impermissibly vague in all of its applications." *Vill. of Hoffman*, 455 U.S., at

---

[7] Plaintiff asserts that "banning any person from discussing self-collected sexual assault kits sweeps vast amounts of constitutionally protected speech within its reach" and in so doing causes companies like Leda to "to steer far wider of the unlawful zone than if the boundaries of the forbidden areas were clearly marked." (Dkt. No. 10 at 21) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 109 (1972)).  However, as discussed *supra*, the Statute does not ban the *discussion* of anything; it prohibits selling, offering to sell, or otherwise making available sexual assault kits intended for at-home use.  Wash. Rev. Code § 5.70.070(2).  Thus, the Statute regulates transactional conduct, not speech.  And to the extent speech is implicated by the proscription on offers to sell, the speech in question is not protected, as it constitutes a "proposal to engage in illegal activity." *Williams*, 553 U.S. at 298.

495.[8]  Thus, the Court must "examine the complainant's conduct before analyzing other hypothetical applications of the law" because "[a] plaintiff who engages in some conduct that is clearly proscribed cannot complain of the vagueness of the law as applied to the conduct of others."  *Id*.

Plaintiff argues that "[i]t is unclear what behavior the Statute proscribes by barring speech that 'otherwise makes available' sexual assault kits."  (Dkt. No. 10 at 21) (quoting Wash. Rev. Code § 5.70.070(2).  The canon of construction *ejusdem generis* counsels that "where general words follow specific words in a statutory enumeration, the general words are construed to embrace only objects similar in nature to those objects enumerated by the preceding specific words."  *Washington State Dept. of Social and Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 384 (2003) (internal quotation marks omitted).  Relatedly, "we rely on the principle of *noscitur a sociis*—a word is known by the company it keeps—to 'avoid ascribing to one word a meaning so broad that it is inconsistent with its accompanying words'" in construing the meaning of a term in a statute.  *Yates v. United States*, 574 U.S. 528, 543 (2015) (quoting *Gustafson v. Alloyd Co*., 513 U.S. 561, 575 (1995)).  Here, the phase "otherwise make available" follows the more specific terms "sell" and "offer for sale."  Wash. Rev. Code § 5.70.070(2).  Read in conjunction with the verbs that precede it, "otherwise make available" encompasses actions related to selling and offering for sale—such as the distribution of free samples.  It is not uncommon for statutes that proscribe conduct to include a final, catch-all term with the word "otherwise," and courts consistently rely on these canons to determine what acts are covered by that statutory phrase.  *See, e.g., Yates* 574 U.S. at 545 (quoting *Begay v. United States*, 553 U.S.

---

[8] "[V]agueness challenges to statutes which do not involve First Amendment freedoms must be examined in the light of the facts of the case at hand."  *United States v. Mazurie*, 419 U.S. 544 (1975).

137, 142–143 (2008) ("[W]e relied on this principle to determine what crimes were covered by the statutory phrase 'any crime ... that ... is burglary, arson, or extortion, involves use of explosives, or otherwise involves conduct that presents a serious potential risk of physical injury to another,' 18 U.S.C. § 924(e)(2)(B)(ii).  The enumeration of specific crimes, we explained, indicates that the 'otherwise involves' provision covers 'only *similar* crimes, rather than *every* crime that 'presents a serious potential risk of physical injury to another.''").  Thus, read alongside the other operative verbs in the statute, the phrase "otherwise makes available" is sufficiently clear to guard against arbitrary or discriminatory enforcement.

Plaintiff further asserts that the phrase "in any manner that indicates" is unconstitutionally vague.  (Dkt. No. 10 at 22) (quoting Wash. Rev. Code § 5.70.070(2)(a)).  However, this term is similarly scrutable when read alongside the "neighboring words with which it is associated."  *Williams*, 553 U.S. at 294.  The Statute prohibits the sale of a sexual assault kit "[t]hat is marketed or otherwise presented as over-the-counter, at-home, or self-collected or in any manner that indicates that the sexual assault kit may be used for the collection of evidence of sexual assault other than by law enforcement or a health care provider."  Wash. Rev. Code § 5.70.070(2).  Taken in context, "in any manner" is a general term that we construe to "embrace only objects similar in nature to those objects enumerated by the preceding specific words": "over-the-counter," "at-home," and "self-collected."  *Keffeler*, 537 U.S. at 384.  Accordingly, it is not a vague phrase but rather refers to ways in which a sexual assault kit might be described to connote the intended use of evidence collection outside a medical or law enforcement setting.  As Defendants suggest, "a sexual assault kit presented as do-it-yourself or self-test would [predictably] fall within the bounds of [the Statute]."  (Dkt. No. 30 at 27.)  "It is not the case that the [Statute's] criteria lack any ascertainable standard for inclusion and

1  exclusion, nor do they contain no guidelines, such that the authorities can arbitrarily prosecute

2  one class of [persons] instead of another."  *Kashem v. Barr*, 941 F.3d 358 at 370, 374 (9th Cir.

3  2019) (internal quotation and citations omitted).[9]  A person of ordinary intelligence reading the

4  Statute would glean fair notice of what conduct is prohibited.

5     Because "it is clear what the statute proscribes 'in the vast majority of its intended

6  applications,'" Plaintiff's vagueness claim fails as a matter of law and would not succeed on the

7  merits.  *California Tchrs. Ass'n v. State Bd. of Educ.*, 271 F.3d 1141, 1151 (9th Cir. 2001)

8  (quoting *Hill v. Colorado*, 530 U.S. 703, 733 (2000)).  Likewise, any as-applied challenge must

9  also fail, as the language of the Statute gives "*these plaintiffs* [] fair notice that *[their] conduct*

10  would raise suspicion under the criteria" and does not "vest the government with unbridled

11  enforcement discretion" as applied to Leda Health.  *Kashem*, 941 F.3d at 370 (emphasis in

12  original).  And because Plaintiff's only argument on irreparable harm is likely success on the

13  merits, Plaintiff fails to establish a likelihood of irreparable harm on its vagueness and

14  overbreadth claims.  (*See* Dkt. No. 10 at 26.)

15

16

---

17  [9] Plaintiff also argues that the term "marketed or otherwise presented" is "unconstitutionally

18  vague because it offers no means of differentiating truthful speech from false or misleading speech in that process." (Dkt. No. 29 at 10).  However, as described *supra*, the term "marketed

19  or otherwise presented" does not regulate speech but rather uses the marketing claims advanced on behalf of a sexual assault kit to identify whether it is subject to regulation under the Statute.

20  *See Nicopure* 944 F.3d at 283 ("the FDA's reliance on a seller's claims about a product as evidence of that product's intended use, in order that the FDA may correctly classify the product

21  and restrict it if misclassified, does not burden the seller's speech"); *City of Providence*, 2012 WL 6128707 at *8 ("the inclusion of a 'public claim or statement made by the manufacturer' to

22  determine whether the described product falls under the definition of a 'flavored tobacco product' . . . does not amount to a prohibition against speech.").  The statute does not proscribe

23  any marketing or promotion of sexual assault kits; it prohibits the sale of sexual assault kits intended for at home use.  A person may freely promote the benefits of at home evidence

24  collection kits; what they may not do is sell kits for at home evidence collection.  *See Nicopure* 944 F.3d at 283; *Whitaker*, 353 F.3d at 958.

1          4.  Bill of Attainder Claim

2          The Constitution instructs: "No Bill of Attainder . . . shall be passed."  U.S. Const. art.

3    I, § 9, cl. 3.  "[A] law that legislatively determines guilt and inflicts punishment upon an

4    identifiable individual without provision of the protections of a judicial trial" is a bill of

5    attainder.  *Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 468 (1977).  The Bill of Attainder

6    Clause is "an important ingredient of the doctrine of 'separation of powers,'" as it prevents

7    legislatures from stepping into the judicial role, or "ruling upon the blameworthiness of, and

8    levying appropriate punishment upon, specific persons."  *Id.* at 649.  "Three key features brand a

9    statute a bill of attainder: that the statute (1) specifies the affected persons, and (2) inflicts

10   punishment (3) without a judicial trial."  *SeaRiver Mar. Fin. Holdings, Inc. v. Mineta*, 309 F.3d

11   662, 669 (9th Cir. 2002).  This tripartite test is not disjunctive, meaning all three elements must

12   be met.  *Nixon*, 433 U.S. at 648 ("[T]he fact that [a statute] refers to [a plaintiff] by name [] does

13   not automatically offend the Bill of Attainder Clause.").  "Only the clearest proof suffices to

14   establish the unconstitutionality of a statute as a bill of attainder."  *SeaRiver*, 309 F.3d at 669.  In

15   examining the Statute's constitutionality, the Court "may only look to its terms, to the intent

16   expressed by Members of Congress who voted its passage, and to the existence or nonexistence

17   of legitimate explanations for its apparent effect."  *Nixon*, 433 U.S. at 484.

18          The Supreme Court has established a set of "guideposts" for "determining whether

19   legislation singles out a person or class within the meaning of the Bill of Attainder Clause."

20   *SeaRiver*, 309 F.3d at 669.  "First, we look to whether the statute or provision explicitly names

21   the individual or class, or instead, describes the affected population in terms of general

22   applicability."  *Id*.  Second, the court assesses "whether the identity of the individual or class was

23   'easily ascertainable' when the legislation was passed."  *Id*. (quoting *Brown*, 381 U.S. at 448–

24

49).  Third, the court examines "whether the legislation defines the individual or class by "past

conduct [that] operates only as a designation of particular persons'" and evaluates whether the

past conduct consists of "irrevocable acts committed by them." *Id*. (quoting *Selective Serv. Sys*.,

468 U.S. at 847–848); *see also Communist Party of U.S. v. Subversive Activities Control Bd*.,

367 U.S. 1, 86 (1961).  The guideposts are intended to be considered holistically.  *SeaRiver*, 309

F.3d at 669.

Plaintiff asserts that Leda Health is the "easily ascertainable" target of the Statute because

"Legislators openly discussed Leda Health when drafting and voting for the bill"; Leda was the

only company to testify at the Bill hearing; Leda was the only company in Washington selling

sexual assault kits at the time the Statute passed; and one sponsor of the Bill "posted online that

her Bill was designed to stop Leda Health from operating in Washington."  (Dkt. Nos. 10 at 24, 1

at 6.)  For the purposes of the foregoing analysis, the Court accepts these factual allegations as

true.  Plaintiff further argues that the Statute "singled out" Leda Health for attainder based on

past conduct (selling EEKs).  *Id*., *see SeaRiver*, 309 F.3d at 669.

As an initial matter, the Statute does not reference Leda Health by name; instead, it is

widely applicable to any person who engages in prohibited conduct.  This cuts against a finding

that Plaintiff was singled out.  *SeaRiver*, 309 F.3d at 670.  And although the hearing testimony

and statements of certain legislators made it clear that the bill would apply to Leda Health, that

application depended entirely on Leda's choosing to *continue* selling EEKs after the Statute

passed (which Leda did not).  Thus, the Statute does not set forth a rule based on irreversible past

conduct like the commission of a felony, rather, it attaches only if a person engages in generally

prohibited activities.  *United States v. Munsterman*, 177 F.3d 1139, 1142 (9th Cir. 1999); *see*

*also Communist Party*, 367 U.S. at 86 (finding the law was not a bill of attainder because it

1    "attache[d] not to specified organizations but to described activities in which an organization

2    may or may not engage").  As in *Communist Party*, "[f]ar from attaching to the past and

3    ineradicable actions of an organization, the application of the [Statute] is made to turn upon []

4    contemporaneous fact"—whether a company is selling, offering for sale, or otherwise making

5    available sexual assault kits for at home use.  *Communist Party*, 367 U.S. at 87.  This

6    "prospective and generalized effect" cuts against a finding that Leda Health has been "singled

7    out" for attainder; unlike laws found to constitute bills of attainder, the Statute neither limits its

8    application to Plaintiffs nor prevents them from conforming their conduct with law.  *SeaRiver*,

9    309 F.3d at 671; *c.f. United States v. Lovett*, 328 U.S. 303, 314–316 (1946) (finding that an

10   appropriations bill that prohibited the compensation of three named three federal employees

11   based on what Congress believed to be their political beliefs constituted a bill of attainder).

12          Courts are clear that "[a]n otherwise valid law is not transformed into a bill of attainder

13   merely because it regulates conduct on the part of designated individuals or classes of

14   individuals."  *Fresno Rifle & Pistol Club, Inc. v. Van De Kamp*, 965 F.2d 723, 727 (9th Cir.

15   1992).  As the Seventh Circuit once highlighted, the fact "[t]hat the plaintiffs were the target, and

16   so far appears the *only target*" of legislation "does not establish that the [legislation] was not a

17   bona fide legislative measure" because "[i]t is utterly commonplace for legislation to be incited

18   by concern over one person or organization."  *LC&S, Inc. v. Warren Cnty. Area Plan Comm'n*,

19   244 F.3d 601, 604 (7th Cir. 2001) (emphasis added).  Here, it is not disputed that the Washington

20   Statute "was incited by concern over one organization"—Leda Health.  But the Statute "applies

21   to a class of activity only."  *Communist Party*, 367 U.S. at 88.  As the Supreme Court warned in

22   *Nixon*, the argument that "an individual or defined group is attainted whenever he or it is

23   compelled to bear burdens which the individual or group dislikes . . . . would cripple the very

24

1    process of legislating, for any individual or group that is made the subject of adverse legislation

2    can complain[.]" *Nixon*, 433 U.S. at 470.  Ultimately, while Leda's business may have

3    singularly inspired legislative action, it was not "singled out" within the meaning of the Bill of

4    Attainder Clause.

5           Furthermore, even if Leda Health had been "singled out," the Statute is not a bill of

6    attainder because it does not inflict legislative punishment but rather furthers a legitimate

7    legislative purpose. "Three inquiries determine whether a statute inflicts punishment on the

8    specified individual or group: "(1) whether the challenged statute falls within the historical

9    meaning of legislative punishment; (2) whether the statute, 'viewed in terms of the type and

10   severity of burdens imposed, reasonably can be said to further nonpunitive legislative purposes';

11   and (3) whether the legislative record 'evinces a congressional intent to punish.'" *SeaRiver*, 309

12   F.3d at 673 (quoting *Selective Serv. Sys. v. Minnesota Pub. Int. Rsch. Grp.*, 468 U.S. 841, 852

13   (1984)).  A statute need not meet all three factors to constitute a bill of attainder; rather, courts

14   weigh each inquiry.  *Id*.  However, "if [an Act] furthers a nonpunitive legislative purpose, it is

15   not a bill of attainder." *Id*. at 674.  Accordingly, the second factor is dispositive insofar as a

16   finding of legitimate legislative purpose defeats a bill of attainder claim.  *Id*.; *see also Nixon*, 433

17   U.S. at 475.

18          "Traditionally, bills of attainder sentenced the named individual to death, imprisonment,

19   banishment, the punitive confiscation of property by the sovereign, or erected a bar to designated

20   individuals or groups participating in specified employments or vocations." *SeaRiver*, 309 F.3d

21   at 662.  The Statute evinces none of these forms of punishment.  Although Plaintiff argues that it

22   was "banished" from Washington, the Statute's prohibition on selling sexual assault kits does not

23   fall within the historical meaning of "banishment," which "has traditionally been associated with

24

deprivation of citizenship, and does more than merely restrict one's freedom to go or remain where others have the right to be: it often works a destruction of one's social, cultural, and political existence." *SeaRiver*, 309 F.3d at 673 (internal quotations omitted).  Moreover, as Defendants point out, "Leda also offers STI testing, toxicology screenings, educational workshops, and emergency contraceptives; passage of HB 1564 does not prevent Leda from offering these other services to Washingtonians."  (Dkt. No. 18 at 29.)

Finally, the Statute "reasonably can be said to further nonpunitive legislative purposes." *Nixon*, 433 U.S. at 475.  Indeed, as in *Fresno Rifle*, "[t]here is no indication that the Legislature's motivation was anything other than a legitimate desire to protect the safety and welfare of the citizens of [Washington]." *Fresno Rifle*, 965 F.2d at 728.  The legislature's stated purpose was "to support survivors of sexual offenses through building victim centered, trauma-informed systems that promote successful investigations and prosecutions of sexual offenses" and protect survivors from the potentially harmful impact of "over-the-counter sexual assault kits."  (Dkt. No. 19-1 at 3).  And although Plaintiff disagrees with the legislature's way of achieving this aim, it offers no evidence that the legislature was motived by an improper desire to *punish* Leda Health rather than proscribe *conduct* brought to its attention by Leda's business model.[10]  As

---

[10] Plaintiff's reliance on *Lovett* is misplaced.  The Statute in *Lovett* "clearly accomplish[ed] the punishment of named individuals without a judicial trial," as the act "specifically cut[] off the pay of certain named individuals found guilty of disloyalty" and prevented them from engaging in future government work "because of what Congress thought to be their political beliefs." *Lovett*, 328 U.S. at 316, 314.  The Act was a consummate example of trial by the judiciary: "No one would think that Congress could have passed a valid law, stating that after investigation it had found Lovett, Dodd, and Watson 'guilty' of the crime of engaging in 'subversive activities,' defined that term for the first time, and sentenced them to perpetual exclusion from any government employment." *United States v. Brown*, 381 U.S. 437, 449 (1965).  Contrastingly, this Statute does not resemble a "special legislative act[] which take[s] away the life, liberty, or property of particular named persons, because the legislature thinks them guilty[.]" *Lovett*, 328 U.S. at 317.

Defendant points out, the public hearing testimony of prosecutors, healthcare workers, advocates for sexual assault victims was largely focused on what sexual assault evidence collection entails and the potential harm posed by products like EEKs—not on Leda Health.  Moreover, exchanges made during the hearings suggested that one of the reasons that Legislature opted to pass a law rather than rely on the cease-and-desist letter to Leda Health was because of its concern with protecting survivors from *other* companies that sell at-home sexual assault evidence collection kits.[11]  In this way, "the legislative record is probative of nonpunitive intentions."  *SeaRiver*, 309 F.3d at 676.  Ultimately, because the Statute "furthers a nonpunitive legislative purpose, it is not a bill of attainder."  *SeaRiver,* 309 F.3d at 674.

Accordingly, Plaintiffs would not succeed on this claim; even construing all factual disputes in Plaintiff's favor, Plaintiff does cannot feasibly "establish the unconstitutionality of [the] [S]tatute as a bill of attainder."  *SeaRiver*, 309 F.3d at 669.  As Plaintiff's only argument on irreparable harm is based on likely success on the merits, Plaintiff fails to establish a likelihood of irreparable harm absent a preliminary injunction.  (*See* Dkt. No. 10 at 26.)

### C.  Remaining Factors

To obtain a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits [and] that he is likely to suffer irreparable harm in the absence of preliminary relief[.]"  *Winter*, 555 U.S. at 20.  Because the Court has found that Plaintiff's constitutional arguments fail as a matter of law and there is no risk of irreparable harm to Plaintiff absent an

---

[11] *See* Hr'g Before H. Comm. on Community Safety, Justice, & Reentry (Wash. Feb. 7, 2023), at 1:18:40–2:12:14, video recording by TVW, https://tvw.org/video/house-community-safety-justice-reentry-2023021199/?eventID=2023021199.  The Court notes that both Plaintiff and Defendant cited video hyperlinks to this hearing in footnotes rather than following the proper procedure of admitting an official transcript or thumb drive of the video into evidence.

ORDER ON MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 10), MOTION TO DISMISS (DKT. NO. 30), AND MOTION FOR EVIDENTIARY HEARING (DKT. NO. 34) - 30

1    injunction, Plaintiff's motion must be denied.  The Court need not reach the remaining factors of

2    public interest and balance of the equities.

3                                            **IV        MOTION TO DISMISS**

4            **A.  Legal Standard**

5            To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient

6    factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft*

7    *v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570

8    (2007)).  "A claim has facial plausibility when the [complaint] pleads factual content that allows

9    the court to draw the reasonable inference that the defendant is liable for the misconduct

10   alleged."  *Id*. (citing *Twombly*, 550 U.S. at 556).  When considering a motion to dismiss for

11   failure to state a claim, the Court must accept as true all well-pleaded factual allegations and

12   construe the allegations in favor of the non-moving party.  *See Wood v. City of San Diego*, 678

13   F.3d 1075, 1080 (9th Cir. 2012).  The Court does not have to accept conclusory, legal

14   assertions.  *Iqbal,* 556 U.S. at 678.  At the preliminary injunction stage, a plaintiff bears "a

15   heavier burden than . . . in pleading the plausible claim necessary to avoid dismissal."  *New Hope*

16   *Fam. Servs., Inc. v. Poole*, 966 F.3d 145, 165 (2d Cir. 2020).

17           **B.  Discussion**

18           The merits of Plaintiff's First Amendment claims fail as a matter of law and not based on

19   the plausibility of Plaintiff's factual allegations.  Even construing the facts in the light most

20   favorable to Plaintiff, the Statute does not regulate protected speech for the reasons described

21   *supra*.  Instead, it burdens only non-expressive conduct.  Thus, Plaintiff does not successfully

22   plead a facial or as-applied First Amendment violation and the first two claims in its Complaint

23   must fail.  Similarly, as discussed *supra*, Plaintiff fails to plead cognizable overbreadth and

24

vagueness claims. The Court's conclusions that these claims fail as a matter of law does not change when construing the factual allegations in Plaintiff's favor.  Finally, the Court found *supra* that even construing all Plaintiff's factual allegations as true, the Statute did not plausibly constitute an unconstitutional bill of attainder.  Plaintiff did not "carr[y] its burden, as the 'one who complains of being attainted,' of establishing 'that the legislature's action constituted punishment and not merely the legitimate regulation of conduct.'"  *SeaRiver*, 309 F.3d 662 at 694 (quoting *Nixon*, 433 U.S. at 476 n. 40).  Thus, this final claim likewise fails under the 12(b)(6) standard.[12]

Accordingly, Defendants' motion to dismiss Plaintiff's Complaint is GRANTED.

## V   CONCLUSION

For the reasons stated above, Plaintiff's motion for preliminary injunctive relief (Dkt. No. 10) is DENIED.  Plaintiff's motion for an evidentiary hearing (Dkt. No. 34) is likewise DENIED as moot, and thus Defendants' surreply (Dkt. No. 40) is also moot.  Defendants' motion to dismiss Plaintiff's claims (Dkt. No. 30) is GRANTED.  Plaintiff's claims are dismissed with prejudice.

Dated this 21st day of October, 2024.

David G. Estudillo
United States District Judge

---

[12] The Court does not reach Defendants' argument that the Eleventh Amendment bars Plaintiff's claim against Governor Inslee, as the Court's finding that all of Plaintiff's claims fail as a matter of law effectively moots the immunity inquiry.  (*See* Dkt. No. 30 at 15.)

ORDER ON MOTION FOR PRELIMINARY INJUNCTION (DKT. NO. 10), MOTION TO DISMISS (DKT. NO. 30), AND MOTION FOR EVIDENTIARY HEARING (DKT. NO. 34) - 32